IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA          :
                                                      :
                    v.                              :  CRIMINAL ACTION NO.
                                                      :  1:10-CR-31-TCB-CCH-3
ZHONG LIANG LI                       :
                                                      :

## **REPORT AND RECOMMENDATION**

Defendant Zhong Liang Li is charged with conspiracy to produce false Georgia driver's licenses, to issue them to persons not qualified to hold such licenses, and to encourage and induce aliens to reside in the United States illegally by providing them with such licenses.

This action is before the Court on Defendant Li's Amended Motion to Suppress Statements [55] (the "Motion"). The Court held an evidentiary hearing on Defendant's Motion on April 26, 2010, and a transcript of that hearing [94] was filed on June 23, 2010. After seeking and receiving several extensions of time to do so, Defendant filed his post-hearing brief in support of the Motion [122] on July 22, 2010, the Government filed a response brief [102] on August 2, 2010, and the Defendant was given until August 9, 2010 to file a reply brief. See Order dated July 15,

2010 [99]. Defendant did not file a reply brief, and the matter was submitted to the undersigned on August 10, 2010.

Defendant argues in his Motion and Memorandum of Law in support thereof that a post-arrest statement he made while being interviewed at offices of the Federal Bureau of Investigation ("FBI") in New York City should be suppressed because it was made without a knowing and voluntary waiver of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).   For the reasons set forth below, **IT IS RECOMMENDED** that the Motion [55] be **DENIED**.

## APPLICABLE LAW

In Miranda the Supreme Court ruled that, because custodial interrogation of arrested suspects in criminal cases is inherently coercive, statements made in response to such interrogation should be treated as presumptively coerced in violation of a defendant's Fifth Amendment rights.  It then held that a defendant's incriminating statements in response to custodial interrogation are not admissible as evidence against him unless, prior to such interrogation,  he has been advised of his right to remain silent; his right to the presence of an attorney, including an appointed attorney

2

if he is unable to afford one, and the fact that anything he says could be used against

him.  Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).

While a suspect in custody may waive these rights and give a statement that

may be used as evidence against his interests, the Supreme Court has held that such

a waiver is valid only if the totality of the circumstances indicates that the statement

was freely and voluntarily given by a person who understood the nature of the rights

and the consequences of waiving them.  Moran v. Burbine, 475 U.S. 412, 421 (1986).

> Echoing the standard first articulated in Johnson v. Zerbst, 304 U.S. 458,
> 464, 58 S. Ct. 1019, 1023, 82 L.Ed. 1461 (1938), Miranda holds that
> "[t]he defendant may waive effectuation" of the rights conveyed in the
> warnings "provided the waiver is made voluntarily, knowingly and
> intelligently."  384 U.S. at 444, 475, 86 S. Ct. at 1612, 1628.  The
> inquiry has two distinct dimensions.  First, the relinquishment of the
> right must have been voluntary in the sense that it was the product of a
> free and deliberate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with a full
> awareness of both the nature of the right being abandoned and the
> consequences of the decision to abandon it.  Only if the "totality of the
> circumstances surrounding the interrogation" reveal both an uncoerced
> choice and the requisite level of comprehension may a court properly
> conclude that the Miranda rights have been waived.

Moran, 475 U.S. at 421 (citations omitted); see also Edwards v. Arizona, 451 U.S.

477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); North Carolina v.

Butler, 441 U.S. 369 (1979); Brewer v. Williams, 430 U.S. 387, 404 (1977).

3

**FINDINGS OF FACT**

1.  On January 21, 2010, at approximately 6:00 a.m. Defendant and his brother were arrested on a street near Defendant's residence in Brooklyn, New York.  The arrest was effected by six to twelve agents, all of whom should have been armed.  There is no evidence, however, that any agent, other than FBI Agent Jude Cheng, displayed a weapon.  Agent Cheng, who was a few paces behind the agents who actually made the arrest, carried a Colt AGK 5 submachine gun, but he never pointed it at either Defendant or his brother.  Incident to their arrest, both Defendant and his brother were handcuffed and patted down.   Transcript of Hearing held on April 26, 2010 (hereinafter "Tr.") at 8-12, 56-60.

2.  While other agents may have asked Defendant standard questions that would normally accompany an arrest, *i.e.*, the suspect's identity and whether he was armed, there is no evidence that anyone asked Defendant or his brother questions about the substance of the offenses which are the subject of the indictment in this case until after they had been transported to the FBI offices in New York at 26 Federal Plaza and had been given their <u>Miranda</u> warnings.  To the contrary, the only evidence is that Defendant was not asked such questions until after his <u>Miranda</u> rights had been explained to him and he had  waived those rights.  Tr. at 12-15, 26, 60-62, 64-66.

3.  FBI Agents Darin Werkin and Brian O'Roark drove Defendant and his brother from the point of their arrest to the FBI office in New York.  While no questions about the charges in this case were discussed during that time, Agents Werkin and O'Roark requested Defendant and his brother not to talk with each other in Chinese.  Tr. at 62, 79.  At some point during the drive to the FBI offices Defendant may have asked why he was being arrested.  He was told it was based on charges out of Georgia  and that the agents would explain further when he was interviewed.  Tr. at 82.

4.  On their arrival at the FBI offices, Defendant and his brother were taken to the "processing" area where they were photographed and fingerprinted.  In addition to routine booking procedures, however, Defendant and his brothers had their cheeks "swabbed" in accordance with a new office policy requiring such a procedure for purposes of obtaining a suspect's DNA.  Tr. at 65.

5.  As part of his processing at the FBI offices Defendant was also required to remove his clothing so that the agents could visually inspect for identifying tattoos and scars. Tr. at 45-46.

6. At some point during his processing Defendant was allowed to call his employer, and at the conclusion of their processing Defendant and his brother were allowed to use the restroom and then were taken to separate interview rooms.  Tr. at 64, 66-67.

7.  In the interview room the agents placed a handcuff on Defendant's left hand and connected it to a metal bar, pursuant to their standard procedure.  Tr. at 47.  Before advising Defendant of his rights the agents inquired as to whether the handcuff was too tight, whether Defendant was comfortable, whether he needed to go to the restroom and whether he needed something to drink.  Tr. at 49.  At no time while Defendant was in the interview room did the agents have any weapons, make any threats, use other than a conversational tone of voice, use any physical force, or make any promises in an effort to get Defendant to waive his Miranda rights and make any statements.  Tr. at 25-26, 31, 71-72.

8.  Before questioning Defendant about the matters alleged in the current indictment Agent Cheng read him his rights as set forth in Miranda v. Arizona, 384 U.S. 436 (1966).  Agent Cheng is proficient in Cantonese, his native tongue, and Defendant asked Agent Cheng to speak to him in Cantonese.  Agent Cheng complied and read Defendant his Miranda rights in Cantonese from an advice of rights form which was printed in Chinese.  He then handed the form to Defendant who took about a minute

to read it.   Defendant appeared to understand his rights as set forth in the form and, when asked, he acknowledged in English that he understood his rights, had no questions, agreed to waive his rights and wanted to talk to the agents.  He also signed the form.  Gov't Ex. 1; Tr. 17-23, 69, 71.

9.  At the time he waived his <u>Miranda</u> rights Defendant appeared alert, spoke and answered questions coherently, and did not appear under the influence of any drugs or medication.  Tr. 24-25, 70.

10.  After Defendant waived his <u>Miranda</u> rights, Agent Werkin questioned him about the charges which are the subject of the present indictment.  Agent Werkin spoke to him in English and Defendant appeared to understand the majority of what Agent Werkin said.  When Defendant had any questions about what he had been asked by Agent Werkin he asked Agent Cheng to translate for him or to explain the question asked, and Agent Cheng did so in Cantonese.  Defendant's answers to Agent's Werkin's questions were given sometimes in English and sometimes in Cantonese; at all times his answers were responsive to the questions asked, whether posed in English or, at his request, interpreted or explained by Agent Cheng in Cantonese. There is no evidence that Defendant did not understand his <u>Miranda</u> rights, the

consequences of his waiver of those rights, or the questions asked after he agreed to be interrogated.  Tr. at 27-30, 74-75.

11.   Defendant signed his waiver of his rights on the Government's "Advice of Rights" form at 8:52 a.m., approximately three hours after his arrest.  Gov. Ex. 1; Tr. at 45.  He was then interviewed for approximately 2 hours.  Tr. at 31.

12.  Agent Cheng recalled that, after Defendant had waived his rights, not immediately after but at some time during the course of his interview, Defendant was told that "it would be good for him to cooperate with us" or "you should cooperate with us."  Tr. at 52-53.

## **DISCUSSION**

As noted above, Defendant argues that his waiver of his <u>Miranda</u> rights was not voluntary, and therefore, that his subsequent statement should not be admissible as evidence in the trial of this case.  To determine whether a waiver of <u>Miranda</u> rights was voluntary the Court must first examine the "totality of the circumstances surrounding the interrogation" and determine whether Defendant's waiver of those rights "was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Second, the

Court must determine whether Defendant's waiver was "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

## I.    **Defendant's Waiver Was Voluntary**.

Defendant argues that his waiver was the result of intimidation arising out of: (1) the force used to arrest him at 6 a.m. (Finding of Fact ["FOF"] 1); (2) his being told while being transported to the FBI office that he was not to converse with his brother in Chinese (FOF 3); (3) his being swabbed for DNA and being required to remove his clothing so that the agents could visually look for identifying tattoos and scars (FOF 4 and 5); (4) his being held for almost three hours before being told in some detail of the charges against him (FOF 4), and (5) his being told, after he had waived his Miranda rights and while being questioned during the course of his interview, that it would be good to, or that he should, cooperate with the agents (FOF 12).

Considering the totality of the circumstances, the Court finds that these facts do not support a finding that Defendant's waiver of his rights was involuntary. While being arrested and processed under any circumstances would be intimidating to

9

anyone, that does not make a statement the product of coercion. "The voluntariness of a *Miranda* waiver depends on the absence of police overreaching and not on any broad sense of 'free choice.'" <u>Dunkins v. Thigpen,</u> 854 F.2d 394, 399 (11th Cir. 1988). None of the facts that Defendant contends intimidated, coerced or deceived him into waiving his <u>Miranda</u> rights, either by themselves or in the aggregate, can fairly be characterized as police overreaching.

While with hindsight one might conclude that Defendant and his brother could have been safely arrested with a lesser show of force, the police are entitled to exercise their judgment as to the number of officers to use and the weapons to display in order to make a safe arrest. It is not the Court's role to rule that using 6 to 12 officers and displaying one machine gun to arrest two fraud suspects is somehow so excessive as to constitute police misconduct, but that some other number of agents, or the use or display of a different type of weapon, would be acceptable police conduct.

Further, as a matter of safety officers transporting suspects can order them not to speak in a foreign language. The suspects are behind the officers in the police vehicle; for their safety the officers must know what they are saying. While Defendant argues that the order not to speak in Chinese contributed to a feeling of isolation and coercion, there was nothing that prevented the Defendant and his brother

from speaking in English and it would not have been "police overreaching" to have isolated Defendant and his brother and to have transported them separately from the point of their arrest to the FBI offices. Thus, there is no overreaching in requiring them to speak in English.

While the processing of the defendants once they arrived at the FBI offices took time and involved a new procedure (swabbing for DNA) and an order that Defendant strip so that he could be visually inspected for tattoos and scars, there is no evidence that these procedures were designed to humiliate and coerce a waiver or statement or were conducted in such a forceful or humiliating manner as to constitute police misconduct. The only evidence is that these procedures were engaged in for a legitimate law enforcement purpose, to obtain identifying information about Defendant.

Similarly, there was no improper conduct in not informing the Defendant of the charges against him in detail until he was in the interview room at FBI offices and an interpreter was available. There is no evidence that Defendant asked for more detail once he was told that the charges came out of Georgia; that, in fact, may have been all he needed to know. In any event, it is not for this Court to question Agent Werkin's decision to wait for an interpreter, Agent Cheng, to be present before

discussing the details of the charges.  That, in fact, was Agent Cheng's role; he was assigned to participate in the arrest because of his proficiency in speaking Chinese. It cannot be police misconduct for an English-speaking FBI agent not versed in Chinese to await the presence of another agent fluent in Chinese before attempting to explain the details of fraud charges to a native Chinese speaker who is not fluent in English.

Finally, the fact that Defendant was told, after waiving his <u>Miranda</u> rights and during the course of his interview, that he should cooperate with the agents, or that it would be good for him to do so, does not make Defendant's earlier waiver involuntary.  His reliance on <u>Hart v. Attorney General of State of Florida</u>, 323 F.3d 884 (11th Cir. 2003) to argue the contrary is misplaced.  In that case, after signing a waiver of his <u>Miranda</u> rights, but before making any inculpatory statements, the defendant asked to speak to another police officer, Officer Schuster, whom he trusted. That request was granted and when Officer Shuster arrived defendant asked her whether he should have a lawyer.  She told him that she could not answer that question.  He then asked her the pros and cons of having a lawyer and, among other things, she told him that  a disadvantage of having a lawyer is that he would tell the

defendant not to answer incriminating questions.  She also told him that "honesty would not hurt him."  The Court found both of these statements to contradict <u>Miranda</u>.

> "The reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination, yet, Schuster in effect told Hart that this was the disadvantage of having a lawyer."
>
> "Telling him that 'honesty wouldn't hurt him' contradicted the <u>Miranda</u> warning that anything he said could be used against him in court."

<u>Hart</u>, 323 F.3d at 894.  In short, <u>Hart</u> involved a suspect who asked the police officers for a clarification of his <u>Miranda</u> rights and who was given advice that was contrary to the <u>Miranda</u> warnings.

Neither circumstance exists in this case.  Defendant did not ask for a lawyer or for advice as to whether he should have a lawyer, and he was not told that having a lawyer could be a disadvantage or that honesty would not hurt.  He was simply encouraged to cooperate with the investigation in a manner not directly contrary to the <u>Miranda</u> warnings.  An interrogating agent can encourage cooperation and not invalidate a waiver of <u>Miranda</u> rights.  <u>See</u> <u>United States v. Davidson</u>, 768 F.2d 1266, 1271 (11th Cir. 1985) (statement to an accused that his "cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary"); <u>United</u>

States v. Graham, 323 Fed. Appx. 793, 797 (11th Cir. 2009) (citing with approval

United States v. Jaswal, 47 F. 3d 539, 542 (2d Cir. 1995) which held that "[T]here is

no inconsistency between the required warning that a defendant's statement may be

used against him and a further statement that cooperation can help him.  Both are

true.").

In summary, noticeably absent from the facts of this case is any evidence of

physical contact or psychological ruses of any type, much less such activity motivated

by a desire to intimidate Defendant into waiving his rights and making a statement.

To the contrary, before Defendant waived his Miranda rights, those rights were read

to him in his native language and he had the opportunity to read them to himself and

apparently did so.  While being told of his rights and asked to waive them, Defendant

was not threatened in any manner, and the agents were solicitous of his needs and

comfort.  Defendant appeared to understand his rights, was not under any medication

and was not promised anything for signing his waiver of rights.  FOF 7 - 10.

When the coercion inherent in custodial interrogation is dissipated by the proper

administration of the Miranda warnings, as in this case, a defendant challenging the

admission of statements made subsequent to the warnings must point to evidence

tending to show that his statements were nonetheless "coerced, compelled or

14

involuntary."   United States v. Lawrence, 889 F. 2d 1187, 1189 (1st Cir. 1989). Considering the totality of the circumstances in this case the Court finds no grounds for concluding that Defendant's statements were coerced, compelled or involuntary. In fact, even if the FBI agents' conduct prior to Defendant's interview was found to be intimidating and somehow improper, as Defendant contends, when the Miranda warnings are properly given to a suspect, as they were in this case, then "thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" Oregon v. Elstad, 470 U.S. 298, 310-311 (1985) (citing Wong Sun v. United States, 371 U.S. 471, 486 (1963)).  In this case, the Court finds that Defendant's decision to waive his Miranda rights, after being advised of those rights, was an act of free will.

II.      **Defendant's Statement Was Made With Full Knowledge Of His Rights And The Consequences Of His Waiver Thereof.**

At the evidentiary hearing on his motion Defendant conceded that he was not contending that his statement should be suppressed because of language issues.  Tr. at 88.  Indeed, the record reflects that there was a competent interpreter present who read Defendant his rights in his native language and that thereafter Defendant was permitted to read his rights from a waiver of rights form that was printed in Chinese.

Further, the interpreter participated in Defendant's interview and, whenever asked, explained to Defendant any statements made or questions asked in English which Defendant indicated he did not understand. <u>See</u> FOF 8-10. Because Defendant did not argue at the hearing or in his brief that he did not have a full understanding of the rights he abandoned when he waived his <u>Miranda</u> rights and of the consequences of his waiver, and because there is no evidence in the record suggesting anything to the contrary, the Court finds that Defendant knowingly and intelligently waived his <u>Miranda</u> rights.

## **RECOMMENDATION**

Because the undersigned concludes that Defendant voluntarily, knowingly and intelligently waived his <u>Miranda</u> rights, **IT IS RECOMMENDED** that the Motion [55] be **DENIED**.

**IT IS SO RECOMMENDED** this 10th day of September, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

16